TERRI L. HOLLAND,

                Plaintiff,            Case No. 06-14083

vs.                         HONORABLE DENISE PAGE HOOD
                                 HONORABLE STEVEN D. PEPE

MICHAEL J. ASTRUE,
Commissioner of Social Security,

                Defendant.
==========================/

## Report and Recommendation

### I.      Background

Terri L. Holland ("Plaintiff" or "Claimant") brought this action under 42 U.S.C. § 405(g) for judicial review of the Commissioner's final decision denying her application for Disability Insurance Benefits (DIB) under Title II of the Social Security Act. Both parties have filed motions for Summary Judgment, which have been referred pursuant to 28 U.S.C. § 636(b)(1)(B) and (C). For the following reasons, it is **RECOMMENDED** that Plaintiff's Motion for Summary Judgment be **DENIED** and Defendant's Motion for Summary Judgment be **GRANTED**.

### A.      Procedural History

Plaintiff filed an application for DIB on May 7, 2003, alleging disability due to chronic lower back pain, bursitis in both hips, arthritis in her upper chest, front ribs and knee, eye pain and carpal tunnel syndrome, beginning September 2, 2000 (R. 38 and 51). Plaintiff's claims

were initially denied on November 10, 2003, and she requested a hearing accordingly (R. 31-35).

Administrative Law Judge (ALJ) Bennett S. Engelman conducted a hearing on January 26, 2006

(R. 497-522). Plaintiff was represented by her current attorney, and Vocational Expert (VE)

Stephanie Leech also testified On January 12, 2006, the ALJ issued an opinion denying

Plaintiff's applications (R. 12-25). The Appeals Council denied Plaintiff's request for review on

July 18, 2006 (R. 6-8).

### B. Background Facts

#### 1. Plaintiff Testimony

##### *Disability Application*

Plaintiff was born April 13, 1967, and was thirty-eight at the time of her hearing (R. 500).

She has a high school diploma and two years of college (R. 57). In the past, Plaintiff worked as

a custodian, paint salesperson and service representative, parking attendant, cook, cashier,

dishwasher, home health care provider and housekeeper and a security area supervisor (R. 52,

63-70). Plaintiff's daily activities include a shower, brushing her teeth and hair, physical

therapy, errands, cooking, laundry, dishwashing, reading, cat care, gardening and dusting (R. 72-

74).

##### *Testimony at January 2006 Hearing*

ALJ Englemon inquired about a cast Plaintiff wore on her foot. On October 10, 2005,

she fractured her foot (R. 499-500). This injury is not part of her claims for DIB (R. 505).

In support of her claim, Plaintiff reported her lower back was the worst of her problems.

She described the sharp pain five to six on a pain scale of zero to ten (R. 504). The pain

radiating from her back to her right hip, right thigh and groin area creating a dull burning

sensation. She could stand for about twenty minutes at a time, then when sitting she would feel

a sharp pain in her back as well as numbness in her buttocks.  (R. 510).  The pain associated with sitting does not prevent her from driving a car, but limits her to short trips.  (R. 515). Because of the back pain, she uses either a walker or a cane.  The walker has a seat that helps her perform her daily activities such as washing (R. 512-3).

Plaintiff has fibromyalgia that prevents her from working because her whole body aches, "[I] feel like some days . . . I'm bruised all over.  I have no energy from it."  (R. 505).  In addition to the back pain and fibromyalgia, she has bursitis in the right knee, degenerative arthritis in the left knee for which she receives cortisone injections for the pain and swelling (R. 505).  She also reported what she called arthritis in her chest.  When asked for clarification of such a diagnosis, she explained that it feels as though she's having a heart attack due to the intensity of the pain, approximately two times per month and triggered by weather (R. 506).

When asked about her mental health, Plaintiff responded that she suffers from depression, post-traumatic stress disorder (caused by an incident that occurred while serving in Desert Storm) and anxiety.  Notwithstanding these conditions, she was not then under the care of a psychiatrist nor had she made a claim for benefits from the Veterans Administration for the post-traumatic stress syndrome (R. 506-7).  Her anxiety disables her when triggered by different situations such as the disability hearing.  In spite of her anxiety, her psychological impairments do not prevent her from functioning (R. 507-8).  She takes a prescription sleeping medication to help her give her a full night's rest, which lessens her anxiety and improves her mood (R. 509).  The sleeping medication is the only psychiatric related drug she takes (R. 509).  Prior to taking the medication, she would sleep only about five to six hours at a stretch, then get up.  (R. 514).  This lack of nighttime rest, would necessitate one or two naps during the day for a half-hour or

longer (R. 514).   The prescription medications she takes for her arthritis, heart arrhythmia and blood pressure also cause fatigue.  (R. 515).

When asked, she testified that she could not lift a gallon of milk and purchases the half gallon size (R. 511). A full gallon causes too much strain on her right shoulder injured during her military service (R. 514).

In the early 1990s, Plaintiff worked as a security supervisor for Nationwide Security involved walking approximately four hours a day doing security rounds of 20 minute interval walks, standing for a half an hour and sitting for three and half hours (R. 515 and 518).  The ALJ asked that if there was a sit/stand option what precluded her from going back to the security supervisor position? The Plaintiff responded that she now requires the additional option to lie down during the day to help ease the pain in her back (R. 516).

### 2.    Medical Evidence

On June 14, 2000, Plaintiff sustained a tibial plateau fracture to her right knee. Fortunately the joint spacing was preserved, there was no effusion and the knee was anatomically aligned.  (R. 155).  At a follow-up visit two months later, Edward M. Wojtys, M.D., an orthopaedic surgeon, concluded that the injury was healed, no surgical intervention was necessary and ordered physical therapy. (R. 141).  Her physical therapy program included exercises that she opted to perform at home and swimming two times a week (R. 228).

In July 2001, Plaintiff saw another for follow-up because of continuing pain (R. 215-6). Dr. Fowler found there to be no sign of excess fluid accumulation, joint line tenderness or crepitus.  Like Dr. Wojtys, he ruled out the need for surgery.   Dr. Fowler recommended that Plaintiff continue with her strength training exercises and to take an anti-inflammatory as needed (R. 216).

During that same visit, Plaintiff complained of her lower back. An x-ray of her back a month later indicated that the lumbar spine was normal according to Asha R. Kaza, M.D., the attending radiologist (R. 153).

December 2001, Caroline Taylor, M.D., saw Plaintiff for complaints of rib, lower back and hip pain (R. 208). Plaintiff was taking Celebrex to help alleviate the pain and reported to Dr. Taylor that she could still exercise by swimming and walking the dog (R. 208). Dr. Taylor determined that her hip did not hinder Plaintiff's ability to engage in exercise nor did it impede her ability to stand (R. 208).

In February 2002, Plaintiff sought treatment at the VA facility for low back pain, degenerative disease of the left knee and depression (R. 202-03). Jung Suh, M.D. referred her to a back clinic for strengthening, stretching and aerobic exercise (R. 203). He noted that Plaintiff's pain lacked "anatomic pathology" (R. 203). A March 2003 MRI of Plaintiff' lumbar spine showed normal alignment, but also a small disc herniation at L5-S1 (R. 150-51).

Dr. Taylor, in October of 2002, reported that x-ray findings showed normal alignment of the lumbar spine with no significant abnormalities (R. 155-56).

Dr. Taylor evaluated a July 2002 x-ray of Plaintiff's right hip, which showed tiny osteophytes of the right S1 joint and an area of density that could represent a calcium deposit (R. 154). In July, August and September 2002, Plaintiff reported continuing right hip pain (R. 192-96). Physical examination, performed by Irene Krokos, M.D., revealed tenderness to palpation but no swelling, rash or skin discoloration (R. 194). Then in November 2002 a magnetic resonance imaging (MRI) study of Plaintiff's right hip showed no significant bone or joint abnormalities (R. 152).

In June 2003, Plaintiff sought further treatment from a neurosurgeon, Ramnath Suresh, M.D., for lower back pain which radiated to her thighs (R. 182). Physical examination showed no weakness, atrophy or sensory abnormalities (R. 182-83). Plaintiff's knee reflexes were brisk and equal and her ankle reflexes were normal (R.182). Range of motion in Plaintiff's lumbar spine was limited by pain, but her gait was normal (R.183). Dr. Suresh found no indication of nerve root compression (R. 183).

A June 2003 x-ray of Plaintiff's right hip showed joint space loss and a bony fragment of uncertain significance; the left hip was within normal limits (R. 147). A n August 2003 MRI study performed by Erin Cochrane, M.D. of Plaintiff's hips showed no significant abnormalities (R. 148-50).

In September 2003, Gerald Koenig, M.D., at the VA hospital administered steroid injections to her hip from (R. 390). Plaintiff complained of pain associated with walking and stair climbing, yet she was able to perform regular hip bursitis exercises with general good tolerance (R. 390). She had back pain, but it was tolerable (R. 390). Physical examination revealed normal strength and neurological signs (R. 390-91).

In January 2004, Plaintiff saw a VA rheumatologist, Kristine Rea, M.D., for right hip pain and complained of falling when her right leg gave out (R. 375). Plaintiff reported that pain in her low back, right shoulder and knees was "tolerable" (R. 375). Plaintiff walked with an uneven gait using a cane in her right hand (R. 376). Physical examination revealed tenderness in both trochanteric bursa (R. 376). The rheumatologist noted 16 of 18 fibromyalgia tender points and crepitus in the knees (R. 376). Dr. Rea suggested an increase dosage of the Celebrex to improve pain relief (R. 376).

Plaintiff continued to seek treatment for right groin and hip pain and falling (R. 308-09, 327, 335-39, 369). Herbert Kaufer, M.D., in February of 2004, observed that Plaintiff's gait with a cane was within normal limits with no asymmetry (R. 369). Dr. Kaufer noted that Plaintiff reported right hip pain with both active and passive range of motion, but there were no signs of thigh atrophy (R.369). He indicated that Plaintiff had a full right hip range of motion except for pain inhibition (R. 369). He opined that Plaintiff's right groin symptoms were out of proportion to the objective right hip abnormalities (R. 369). Plaintiff retained full strength and continued to report her back pain was "tolerable" (R.308-09, 327, 369). Plaintiff reported that steroid injections worked well (R. 308). February 2004 x-rays of Plaintiff's pelvis and right hip showed early osteoarthritis, but no significant sacroiliac joint change (R. 256-58). In June 2004, she reported her pain was "reasonably controlled with Elavil [an antidepressant], Celebrex and acetaminophen (R. 335). In December 2004, Plaintiff received steroid injections for hip pain (R. 283).

Additional physical symptoms included pain with her right shoulder. In May 2003, she sought treatment for her right shoulder from Robert Stchur, M.D., Orthopaedist (R. 184). He recommended that she continue with her then current physical therapy regimen in order to continue improving her condition. The physical therapy include rotational shoulder exercises that utilized strengthening bands (R. 184). Her VA visit in September of 2003 with Dr. Koenig found her right shoulder rotation to be limited (R. 391).

As for a diagnosis of fibromyalgia, there is a paucity of medical evidence in the record, only passing references to Plaintiff as one with fibromyalgia without any clinic findings supporting such a conclusion. These references include: a November 2004 by Shanti Eswaran, M.D. that Plaintiff presented with myalgias and a medical history of "chronic pain/fibromyalgia"

(Tr. 285-86); Dr. Rhea's December 2004 report indicating that Plaintiff was a patient with fibromyalgia (R. 283); and a March 2005 office note by Jessica Shill, M.D. stating that a Plaintiff is a patient with fibromyalgia (R. 271). As discussed above, Dr. Rhea, a rheumatologist noted 16 of 18 fibromyalgia tender points and crepitus in the knees, but her final assessment did not include a diagnosis of fibromyalgia (R. 376).

As to Plaintiff's eye condition, in March 2004 vision check by Jeffrey Zink, M.D., documented a diagnosis of glaucoma and Meesman corneal dystrophy, a disease involving tiny cysts and erosions in the cornea, resulting in blurred vision and mildly decreased visual acuity (R. 359-60). In April 2004 the chief of ophthalmology at the VA facility, Michael Roth, M.D. indicated that he "question[ed] the accuracy and believability of the fields in view of the physical findings," and also, "question[ed] secondary gain" (R. 345). In October 2004, another ophthalmologist, James L. Adams, M.D., questioned the reliability of Plaintiff's complaints of "tunnel vision" in light of the physical findings and her activities (R. 314).

As to her psychological conditions, Plaintiff - referred by the Women's Health Clinic for depressive symptoms including being tearful, having difficulty sleeping and feeling sad and hopeless - sought treatment to help her cope with the knee injury and the subsequent job loss (R. 219). Marcia Valenstein, M.D., evaluated Plaintiff on August 27, 2001 for these symptoms (R. 212). During the evaluation, Plaintiff stated that she was in a "pretty good mood," rating that mood to be a six or seven, with ten being the happiest. She told the evaluating psychiatrist that she was still able to enjoy many activities, including movies and walks despite her two-year struggle with depression. At some time during those two years, she took Celexa, an antidepressant, that was subsequently discontinued by her treating physician, Dr. Healy from the Women's Health Clinic because of the side effects which included, hot flashes, diarrhea and

night sweats.  It was Dr. Valenstein's conclusion that Plaintiff was not in need of a different antidepressant and felt that therapy should be arranged (R. 212).

In October 2003, licensed psychologist Elizabeth S. Bishop, Ph.D., examined Plaintiff at the request of the state agency (R. 231-34).  It was Plaintiff's opinion that her physical problems were her primary concern, not her psychological ones.  Plaintiff described her mood to be irritable and cranky, though overall less depressed.  With her history of post-traumatic stress disorder, she continued to have startle reactions, flashbacks and nightmares.

Still, Plaintiff cared for her dog and cat, ran errands, shopped, paid bills, read, wrote poetry, did light cleaning, cooked and did laundry (R. 232).  Plaintiff reported to Dr. Bishop that she was able to maintain meaningful long-term friendships and family relationships(R. 232).  Plaintiff demonstrated good reality contact and was pleasant (R. 232).  It was Dr. Bishop's conclusion that Plaintiff suffered from depression - both recurrent and moderate - and post-traumatic stress disorder.  The doctor estimated Plaintiff's overall Global Assessment of Functioning Score to be at 60, which according to the "Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition (DSM-IV)" suggests evidence of moderate symptoms or moderate difficulty in social, occupational or school functioning (R. 232).   The doctor advised that Plaintiff might benefit from psychotherapy treatment for her depression and Post-Traumatic Stress Disorder.

Plaintiff also attended group therapy in February and March of 2003 to help her with her depression as a result of her physical ailments (R. 364).  During one session, a tearful Plaintiff addressed these feelings by pointing to her walker and stating, "[t]hat's my life from now on." (R. 366).  The nurse practitioner, Nancy McKee, overseeing the work done in group therapy drew no conclusion either good or bad as to Plaintiff's progress.

In September 2003, David Mika, D.O., a reviewing physician for the DDS, performed a Residual Functional Capacity (RFC) assessment and concluded that Plaintiff retained the ability to do work that involved lifting and carrying twenty pounds occasionally and ten pounds frequently and could stand/walk and sit about six hours each during an eight-hour work day (Tr. 85-92); she could occasionally climb ramps and stairs but never climb ladders, ropes or scaffolds (Tr. 87); she while limited to occasional stooping and crouching is able to frequently balance, kneel and crawl (Tr. 87); she is able to handle or feel objects and her ability to reach and perform fine manipulation was unlimited (Tr. 88). As to her job limitations, Dr. Mika opined that Plaintiff had a limited ability to use her upper extremities to push or pull (Tr. 86), and she should avoid concentrated exposure to vibration (Tr. 89).

3. **Evidence Submitted after the January 12, 2006 decision to the Appeals Council** [1]

After the ALJ issue his January 12, 2006, decision, Plaintiff submitted additional records to the Appeals Council in connection with her request for review. These records include January 30, 2006, left foot x-ray reports which revealed signs of a remote ankle trauma (Tr. 463-64); October 2005 left foot x-rays (Tr. 465-67); and numerous other 2005 laboratory reports and office notes from the VA (Tr. 467-96).

4. **Vocational Evidence**

---

[1] Because this evidence was not before the ALJ when he rendered the final decision of the Commissioner, it cannot be considered for substantial evidence review. *See Wyatt v. Secretary of Health and Human Services*, 974 F.2d 680, 685 (6th Cir. 1992). The only purpose for which this Court can consider this additional evidence is to determine whether this case should be remanded to the agency pursuant to the sixth sentence of 42 U.S.C. § 405(g). *Cotton v. Secretary of Health and Human Services*, 2 F.3d 692, 695-96 (6th Cir. 1993). This court may remand the case if the additional evidence is new and material, and if there was good cause for failure to incorporate the additional evidence into the record at a prior hearing. 42 U.S.C. § 405(g) (sentence six); *See Wyatt*, 974 F.2d at 685; *Casey v Secretary of Health and Human Services*, 987 F.2d 1130, 1233 (6th Cir. 1993).

VE Stephanie Leech appeared and testified that Plaintiff's past work as a security guard was light and semi-skilled work (R. 520). The ALJ asked the VE if after hearing the testimony her classification of the job changed; the VE responded, "No." (R. 520), adding that typically a security guard can sit and stand throughout a shift, but lying down would not be an option (R. 520).

The ALJ then directed the VE to address Dr. Bishop's psychological report with a finding that Plaintiff was an individual with a GAF score of 60 functioning with moderate psychological impairments, specifically the ALJ asked the VE if Plaintiff would be able to perform work as a security guard with those limitations (Tr. 520). The VE did not feel that this type of psychological limitation prevented someone from working as a security guard.

Plaintiff's attorney did not have any questions for the VE.

### 4. **ALJ Engelman's Decision**

ALJ Engelman found that Plaintiff met the insured status requirements of the Social Security Act through January 12, 2006, but had not engaged in substantial gainful activity since she allegedly became disabled (R. 16-7). He found that Plaintiff's post right tibial fracture, post-traumatic stress disorder, major depressive disorder, eye problems and low back pain were "severe" impairments within the meaning of the Regulations, but not "severe" enough to meet or medically equal one of the impairments listed in Appendix 1, Subpart P, or Regulations No. 4 (R. 21).

Plaintiff had the RFC to perform light work in a low stress environment with a sit/stand option for an eight-hour workday (R. 22-3). He found that Plaintiff retained the RFC to return to her past employment of security area supervisor for it fit the criteria for a low stress, sit/stand

option work environment necessary to allow Plaintiff to continue to be a productive member of the national economy (R. 23).

In determining Plaintiff's RFC, ALJ Engelman accorded little weight to Plaintiff's allegations that her symptoms result in a RFC precluding her from performing her past relevant work as a security area supervisor (R. 22). He found that the allegations by the claimant as to the intensity, persistence and limiting effects of his symptoms were not well supported by probative evidence and not wholly credible, for Plaintiff engaged in normal daily and social activities, never required long-term hospitalization for physical or mental difficulties, needed no surgical intervention or aggressive treatments, did not suffer from significant medication side effects, and obtained good relief for her ailments from prescription medication (R. 22-3). Further, Plaintiff's statements regarding the effects of her impairments on her ability to work were not consistent with the medical and other evidence taken as a whole (R. 23).

Based on Plaintiff's RFC, the ALJ found that Plaintiff could perform her past relevant work as a security area supervisor (Tr. 23). Thus, she was not disabled within the meaning of the Social Security Act.

## II.    Analysis

### A.    Standards of Review

In adopting federal court review of Social Security administrative decisions, Congress limited the scope of review to a determination of whether the Commissioner's decision is supported by substantial evidence. *See* 42 U.S.C. § 405(g); *Sherrill v. Sec'y of Health and Human Servs.*, 757 F.2d 803, 804 (6th Cir. 1985). Substantial evidence has been defined as "[m]ore than a mere scintilla;" it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting

*Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  The Commissioner's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion.  *Mullen v. Brown*, 800 F.2d 535, 545 (6th Cir. 1986) (*citing Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

      **B.**    **Factual Analysis**

In her motion for summary judgment, Plaintiff argued that (1) ALJ Engelman failed to give proper consideration to Plaintiff's pain, specifically to account for the issue of fibromyalgia; (2) ALJ Engelman improperly assessed the effect of the medication taken by Plaintiff; and (3) ALJ failed to adequately question the VE and drew illogical conclusions based on the deficient examination.

      **1.**    ***Medical Evidence and Plaintiff's Credibility***

Plaintiff claims that the ALJ improperly assessed her credibility and as a result failed to account for Plaintiff's self-reported fibromyalgia.  Subjective evidence is only considered to "the extent...[it] can reasonably be accepted as consistent with the objective medical evidence and other evidence (20 C.F.R. 404.1529(a))"  *Duncan v. Secretary of Health & Human Servs.,* 801 F.2d 847, 852 (1986).  While the issue of a claimant's credibility regarding subjective complaints is within the scope of the ALJ's fact finding discretion when making a determination of disability, (*Kirk v. Secretary of Health & Human Servs.*, 667 F.2d 524, 538 (6th Cir. 1981); *Jones v. Commissioner of Social Sec.*,  336 F.3d 469, 476 (6th Cir. 2003), there are limits on the extent to which an ALJ can rely on "lack of objective evidence" in discounting a claimant's testimony.

While the underlying condition must have an objective basis, neither the Social Security Act nor the regulations require a claimant to prove the degree of pain and limitations by

objective medical evidence. Thus, an adjudicator may not reject a claimant's subjective complaints based solely on a lack of objective medical evidence to fully corroborate the alleged severity of pain. Section 404.1529(c)(2),11  29 C.F.R. § 404.1529(c)(2) states:

> We will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work solely because the available objective medical evidence does not substantiate your statements.

 *See also Duncan,* 801 F.2d at 853; *Cotton v. Bowen,* 799 F.2d 1403, 1407 (9th Cir. 1986); *Bunnell v. Sullivan,* 947 F.2d 341, 345 (9th Cir. 1991) (*en banc*); *Benson v. Heckler,* 780 F.2d 16, 17 (8th Cir. 1985); *Halpin v. Shalala,* 999 F.2d 342, 346 (8th Cir. 1993).

Yet, in determining the existence of substantial evidence, it is not the function of a federal court to try cases *de novo*, resolve conflicts in the evidence, or decide questions of credibility. *See Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). In *Jones* the Court noted that an ALJ can reject a claimant's credibility on pain and other symptoms, and exclude these from the hypothetical question to the VE, if the ALJ's reasons are adequately explained. *Jones,* 336 F.3d at 476.

In order for an ALJ to properly discredited a claimant's subjective testimony, the credibility determination must be accompanied by a detailed statement explaining the ALJ's reasons. S.S.R. 96-7p directs that findings on credibility cannot be general and conclusory findings, but rather they must be specific. The ALJ must say more than the testimony is not credible. *Felisky v. Bowen*, 35 F.3d 1027, 1039 (6th Cir. 1994), made it clear that the ALJ cannot merely recount the medical evidence and claimant's daily activities and then without analysis summarily conclude that the overall evidence does not contain the requisite clinical,

diagnostic or laboratory findings to substantiate the claimant's testimony regarding pain. *Id*. at 1039.

Plaintiff considers herself to be a person with fibromyalgia, the record, however, does not evidence a diagnosis of the condition, nor does it support a finding that such a condition disables Plaintiff from returning to work. Plaintiff failed to list fibromyalgia as an illness, injury or condition that limits her ability to work on the Disability Report, Form SSA-3368-BK, Sec.2 (A). While fibromyalgia is difficult to determine and subjective evidence is used more extensively given the limited objective determinants, at minimum this Court would need a firm diagnosis of the condition to consider the effects of such a disability. The medical record does not show that Plaintiff had fibromyalgia, as she alleges. As noted above, in January 2004, a Dr. Rhea noted 16 of 18 tender points, but did *not* include fibromyalgia in her diagnoses (R. 376). Thereafter, various health care professionals from time to time identified Plaintiff as an individual "with fibromyalgia" (R. 271, 285-88, 328). But these conclusions were not based on any clinical tests and evaluations that are indicated in the record. No specific diagnosis of fibromyalgia, by a medical source using the accepted testing protocol for that condition, exists in the record. Plaintiff never received treatment to specifically address symptoms of fibromyalgia. *See Blacha v. Secretary of Health and Human Services*, 927 F.2d 228, 231 (6th Cir. 1990) (per curiam) (failure to seek treatment undermines claims of debilitating limitations). No physician sought testing to rule out other arthritic or rheumatological disorders that would help narrow the scope of possible diagnoses. *See e.g. Preston v. Secretary of Health and Human Services*, 854 F.2d 815, 817-18 (6th Cir. 1988) ("There are no objective tests which can conclusively confirm the disease; rather it is a process of *diagnosis by exclusion* and testing of certain "focal tender points" on the body for acute tenderness") (emphasis added). Rather, after the word

"fibromyalgia" first appeared in the medical record, it became part of Plaintiff's medical history often responded but never substantiated. Thus, to the extent that Plaintiff failed to provide the ALJ with a diagnosis of fibromyalgia or a claim of such, the ALJ did not act unreasonably in his disregard of the issue in his opinion.

Plaintiff limits her challenge to the ALJ's assessment of her RFC as it pertains to fibromyalgia. The ALJ, however, went further and analyzed all of the medical evidence to support his conclusion that Plaintiff, notwithstanding her impairments, was capable of performing, low-stress, light work with a sit/stand option (R. 23). The record as a whole supports the ALJ's assessment of the nature and severity of the limitations caused by Plaintiff's impairments.

Dr. Mika, a state agency physician, found that Plaintiff could perform the exertional requirements of light work (R. 82-92). The ALJ, nevertheless, reasonably credited Plaintiff's complaints that sitting and standing for extensive periods caused her pain by finding that she needed a sit/stand option (R. 23). None of Plaintiff's physicians indicated additional limitations were necessary. While Dr. Mika opined Plaintiff had some limitations in fine and gross motor coordination based on the diagnosis of carpal tunnel syndrome (R. 87-88), the ALJ reasonably noted that the record did not support a finding that Plaintiff was limited by carpal tunnel syndrome nor was it a condition that was a severe impairment within the meaning of the Social Security Act. (R. 21).

Finally, Plaintiff's daily activities did not reflect a limitation in upper extremity function (R. 22). *See* 20 C.F.R. § 404.1529(c)(3)(I) (ALJ considers the claimant's daily activities in determining functional restrictions due to pain); *Walters v. Commissioner of Social Security*, 127 F.3d 525, 532 (6th Cir. 1997). She cared for her personal needs, did light house cleaning,

prepared meals, shopped, did laundry, paid bills, drove, wrote poetry, did crossword puzzles and latch hook projects and fished. (R. 22, 72-74, 232). Additionally, Plaintiff engaged in several part-time jobs after she allegedly became disabled, but she never complained that she had difficulty due to upper extremity limitations (R. 191, 204, 207-08, 220, 232, 311, 390). *See* 20 C.F.R. § 404.1529(c)(3)(I); *Walters*, 127 F.3d at 532.

Other probative factors also provided substantial support for the ALJ's finding that additional limitations were unwarranted. For example, the ALJ noted that while Plaintiff claimed a variety of musculoskeletal impairments prevented her from work, the laboratory and clinical findings throughout the record, showed at most minimal abnormalities (R. 23). Dr. Sun evaluated a June 2003 x-rays of Plaintiff's right hip and found that it showed joint space loss and a bony fragment of uncertain significance (R. 147). Yet an August 2003 MRI follow-up study performed by Erin Cochrane, M.D. of Plaintiff's hips showed no significant abnormalities (R. 148-50). Dr. Suh noted that Plaintiff's back pain lacked any explanation related to "anatomic pathology" (R. 203). The March 2003 MRI of Plaintiff' lumbar spine which showed normal alignment, did also indicate a small disc herniation at L5-S1 (R. 150-51). A subsequent appointment with Dr. Suresh, a neurologist, evaluating her back problem found no indication of nerve root compression (R. 183).

None of the physicians who examined and diagnosed Plaintiff indicated a belief that would preclude ability to return to work, they all felt that she could. Under 42 U.S.C. 405(g), Congress has limited federal court's authority in disability reviews, and if substantial evidence supports the ALJ's decision, as it does in this case with many medical sources supporting the ALJ's finding, it must be affirmed – even if substantial evidence also supports the opposite conclusion, and even if this Court would have reached a different conclusion. *See Buxton v.*

*Halter*, 246 F.3d 762, 772-773 (6th Cir.2001)(substantial evidence standard encompasses a "zone of choice" within which the Commissioner can act without court interference (internal citations omitted)).  Given the unequivocal medical evidence and the evidence that Plaintiff could manage her personal care needs with limited assistance, was oriented to person, place, and time, and in all other respects is able to function on a daily basis, substantial evidence supports the ALJ's decision to discount Plaintiff's credibility.

### 2. *Effect of the medication taken by Plaintiff*

Plaintiff argues that the ALJ failed to account for the effect of the medication on the Plaintiff.  The ALJ found that Plaintiff's the conditions were adequately relieved by prescription medications taken in their proper dosage (R. 23). *See* 20 C.F.R. § 404.1529(c)(3)(iv)-(v) (in evaluating the nature and severity of the symptoms a claimant is experiencing, the ALJ considers the type, dosage, effectiveness, and side effects of medication and other treatment utilized to alleviate symptoms).

Notwithstanding the efficacy of the medication, Plaintiff argues that their side effects of tiredness and nausea prevent her from returning to work.  As to the tiredness argument, she argues that her former job would not allow a worker to lie down or nap during the day.  The ALJ found that  Plaintiff did not have a medical need for naps or lying down during the day (R. 23). "No physician has reported daily napping or resting as a necessary or helpful measure for treating the claimant's impairments." (R. 23).  It is Plaintiff's burden to provide a complete record enabling the ALJ to make a disability determination.  *Landsaw v. Sec. of Health & Human Servs.*, 803 F.2d 211 (6th Cir. 1986) (*citing* 20 C.F.R. §§ 416.912, 416.913(d)).  The ALJ properly concluded - based on Plaintiff's lack of evidence to the contrary - that daily naps were not medically necessary.

As for the nausea side effect from medication, the only medication taken by Plaintiff that the undersigned could find that referenced such an effect was the Celexa an antidepressant. Because of the side effect, the medication was subsequently discontinued by her treating physician, Dr. Healy from the Women's Health Clinic. Neither the ALJ nor the Plaintiff address which other medication caused such a side effect. A reasonable ALJ could conclude that any adverse effect of the Celexa was ended upon discontinuation of its use, and therefore nausea did not prevent Plaintiff's return to work.

### 3. *Questions for VE Leech*

Plaintiff's, last issue is that the ALJ failed to adequately question the VE and drew an impermissible conclusion. Plaintiff's counsel cites no legal authority to support his argument nor does he explain how ALJ Englemon's line of questioning resulted in significant prejudice to Plaintiff. It is well settled law that "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to...put flesh on its bones." *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) (quoting *Citizens Awareness Network, Inc. v. United States Nuclear Regulatory Comm'n*, 59 F.3d 284, 293-94 (1st Cir. 1995)).

While it is true that the ALJ has a duty to fully and fairly develop the record so that a just determination may be made (*Highfill v. Bowen*, 832 F.2d 112, 115 (8th Cir. 1987)) and this duty still exists where the claimant is represented by counsel (*Conley v. Bowen*, 781 F.2d 143, 146 (8th Cir. 1986)), but ultimately, "the burden of providing a complete record, defined as evidence complete and detailed enough to enable the Secretary to make a disability determination, rests with the claimant." *Landsaw v. Sec. of Health & Human Servs.*, 803 F.2d 211 (6th Cir. 1986)

(*citing* 20 C.F.R. §§ 416.912, 416.913(d)).  ALJ has a heightened duty to "scrupulously and conscientiously probe into, inquire of and explore for all relevant facts" to fully and fairly develop the record only when a claimant is not represented by counsel (*Lashley*, 708 F.2d at 1052).  Courts have also found that a heightened duty only exists, "under special circumstances, i.e., when a claimant is without counsel, is not capable of presenting an effective case, and is unfamiliar with hearing procedures." *Trandafir v. Comm'r of Soc. Sec.*, 58 Fed. Appx. 113 (6th Cir. 2003) (*citing, Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 856 (6th Cir. 1986); *Lashley*, F.2d at 1052).

"There is no bright line test for determining when the administrative law judge has assumed the role of counsel or failed to fully develop the record. The determination in each case must be made on a case by case basis." *Lashley*, 708 F.2d at 1052.  Here, Plaintiff was represented by counsel at the hearing; therefore ALJ Englemon did not have a heightened duty to develop the record (R. 499).  When the claimant is represented in the proceedings, the ALJ is entitled to rely on the claimant's counsel to "structure and present claimant's case in a way that the claimant's claims are adequately explored." *Hawkins v. Chater*, 113 F.3d 1162, 1167 (10th Cir. 1997). Thus, the claimant's counsel must, at the least, identify any additional information that is sought. *Hawkins*, 113 F.3d at 1167.  Plaintiff's attorney was given the opportunity to question VE Leech and adequately explore Plaintiff's claims, but declined stating, "I don't have any further questions." (R. 521).

From the record, ALJ Englemon did make adequate inquiries developing the record as to Plaintiff's RFC relating to her past relevant work experience.  In response to a hypothetical question posed by ALJ Englemon that assumed a Global Assessment Score of 60, VE Leech testified that such a person could perform work as a security guard.  (R. 520-1). The ALJ asked a

follow-up question to include into the hypothetical further details of security guard work such as sitting, standing and walking. (R. 521). Given those additional parameters, the VE again concluded that such a hypothetical person could work as a security guard. In his decision, ALJ Englemon could properly rely on VE Leech's testimony that "based upon the claimant's residual functional capacity, the claimant could return to her past relevant work as security area supervisor as previously performed and as generally performed in the national economy." (R. 23). ALJ Englemon complied with his duty to fully and fairly develop the record, thus Plaintiff's argument is without merit.

## IV. Recommendation

For the reasons stated above, it is Recommended that Plaintiff's Motion for Summary Judgment be Denied and Defendant's Motion for Summary Judgment be Granted. The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Sec'y of Health and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local, 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the

opposing party may file a response. The response shall be not more than twenty (20) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections.


Dated: October, 22 2007                                    s/Steven D. Pepe
Ann Arbor, Michigan                                        United States Magistrate Judge



<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on <u>October 22, 2007</u>, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to the following:<u> Janet L. Parker, J. Gregory Frye</u>, and I hereby certify that I have mailed by United States Postal Service the paper to the following non-ECF participants:<u> Social Security Administration - Office of the Regional Counsel, 200 W. Adams, 30th. Floor, Chicago, IL 60606</u>


                                        s/James P. Peltier
                                        James P. Peltier
                                        Courtroom Deputy Clerk
                                        U.S. District Court
                                        600 Church St.
                                        Flint, MI 48502
                                        810-341-7850
                                        pete_peltier@mied.uscourts.gov